**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROTHE DEVELOPMENT, INC.,      ) | |
| ) | |
| Plaintiff,      ) | |
| ) | |
| v.      ) | Civil Action No. 12-cv-0744 (KBJ) |
| ) | |
| DEPARTMENT OF DEFENSE, *et al.*,      ) | |
| ) | |
| Defendants.      ) | |
| ) | |

## MEMORANDUM OPINION

Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a) (2012), establishes a business development program for "socially and economically disadvantaged small business concerns[.]" *Id.* § 637(a)(1)(B). Plaintiff Rothe Development, Inc. ("Rothe" or "Plaintiff") is a small business based in San Antonio, Texas that has filed the instant action against the Department of Defense ("DOD") and the Small Business Administration (collectively, "Defendants") to challenge the constitutionality of the Section 8(a) program on its face. (*See* Compl., ECF No. 1, ¶ 1.) Rothe argues that the statute's definition of "socially disadvantaged" small business owners, 15 U.S.C. § 637(a)(5), is a racial classification that violates Rothe's right to equal protection under the Due Process Clause of the Fifth Amendment of the United States Constitution. (*See* Compl. ¶¶ 1–2.) Rothe also claims that Section 8(a) violates the nondelegation doctrine. (*See id.*; *see also id.* ¶ 30.)

The constitutional challenge that Rothe brings in the instant case is nearly identical to the challenge brought in the case of *DynaLantic Corp. v. United States Department of Defense*, 885 F. Supp. 2d 237 (D.D.C. 2012). The plaintiff in

*DynaLantic* sued the DOD, the Small Business Administration, and the Department of the Navy alleging, *inter alia*, that Section 8(a) was unconstitutional both on its face and as applied to the military simulation and training industry. *See DynaLantic*, 885 F. Supp. 2d at 242. The *DynaLantic* court disagreed with the plaintiff's facial attack; it explained in a lengthy opinion the reasoning behind the Court's conclusion that the Section 8(a) program is facially constitutional. *See id.* at 248–80, 283–91. Here, Rothe relies on substantially the same record evidence and nearly identical legal arguments, and it urges this Court to strike down the race-conscious provisions of Section 8(a) on their face and thus to depart from *DynaLantic*'s holding in the context of the instant case. (*See, e.g.*, Mot. Hr'g Tr., Oct. 20, 2014, at 27:21 (Plaintiff's counsel asserting that the *DynaLantic* court "was just wrong").)

Before this Court at present are the parties' cross-motions for summary judgment, as well as the parties' motions to limit or exclude the proffered testimony of each other's expert witnesses—commonly referred to as "*Daubert* motions" based on the Supreme Court's seminal ruling on the admissibility of expert testimony in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). As explained fully below, this Court concludes that Defendants' experts meet the relevant qualification standards under Federal Rule of Evidence 702 and offer what appear to be reliable and relevant opinions; therefore, Plaintiff's *Daubert* motion to exclude Defendants' proffered expert testimony will be **DENIED**. By contrast, this Court finds sufficient reason to doubt the qualifications of one of Plaintiff's experts and to question the reliability of the testimony of the other; consequently, Defendants' *Daubert* motions to exclude Plaintiff's expert testimony will be **GRANTED**. With respect to the cross-motions for

summary judgment, this Court agrees with the *DynaLantic* court's reasoning, and thus this Court, too, concludes that Section 8(a) is constitutional on its face.  Accordingly, Plaintiff's motion for summary judgment will be **DENIED**, Defendants' cross-motion for summary judgment will be **GRANTED**, and judgment will be entered in Defendants' favor.  A separate order consistent with this memorandum opinion will follow.

## I.   BACKGROUND

### A.  The Section 8(a) Program

Congress enacted the Small Business Act of 1953 ("the Act"), 15 U.S.C. §§ 631–57s, in order to encourage and develop the "capacity of small business" in America, and thereby to promote national "economic well-being" and "security[.]" 15 U.S.C. § 631(a) (1958).  Section 8(a) of the Act grants the Small Business Administration the authority to acquire procurement contracts from other government agencies and to award or otherwise arrange for performance of those contracts by small businesses "whenever [the agency] determines such action is necessary[.]"  *Id.* § 637(a). This authority remained "dormant for a decade" after the Act's passage, *DynaLantic*, 885 F. Supp. 2d at 253, but over the course of many years and after a series of executive orders and legislative amendments, *see id.* at 253–57, the current Section 8(a) program emerged with the express purpose of helping socially and economically disadvantaged individuals who own small businesses "compete on an equal basis in the American economy[,]" 15 U.S.C. § 631(f)(2)(A) (2012).

The Section 8(a) program provides small businesses that socially and economically disadvantaged individuals own—the Small Business Administration refers to such businesses as "small disadvantaged businesses" or "SDBs," *see* Small

Disadvantaged Business Program, 73 Fed. Reg. 57,490 (Oct. 3, 2008)—with valuable

"technological, financial, and practical assistance, as well as support through

preferential awards of government contracts[,]" *DynaLantic*, 885 F. Supp. 2d at 243;

*see also* 15 U.S.C. § 636(j)(10)(A); 13 C.F.R. § 124.404.[1]  SDBs can receive myriad

types of assistance and support under the Section 8(a) program, including help

"develop[ing] and maintain[ing] comprehensive business plans[,]" 15 U.S.C.

§ 636(j)(10)(A)(i); "nonfinancial services" such as "loan packaging, [] financial

counseling, [] accounting and bookkeeping assistance, [] marketing assistance, and []

management assistance[,]" *id.* § 636(j)(10)(A)(ii); assistance "obtain[ing] equity and

debt financing[,]" *id.* § 636(j)(10)(A)(iii); and the opportunity to compete for certain

government contracts that are limited to Section 8(a) program participants, *see*

*id.* § 637(a)(1)(D).  Moreover, once admitted into the Section 8(a) program,

participating SDBs may stay in the program for up to nine years, provided that they

continue to meet the eligibility criteria for qualifying for—and remaining in—the

program.  *See id.* § 636(j)(10)(C); 13 C.F.R. § 124.2.  Specifically, at all times

applicants and participants must: (1) be a "small" business, as that term is defined in

13 C.F.R. § 121, *see* 13 C.F.R. §§ 124.101, 124.102; (2) demonstrate their business's

potential to succeed, *see id.* § 124.101; and (3) have a majority owner or owners who

are current U.S. residents and citizens of good character, and who are also "socially and

economically disadvantaged" as the statute defines those terms, *id.*

---

[1] A business may obtain SDB status by virtue of applying for and participating in the Section 8(a) program—and only SDBs may participate in the Section 8(a) program—however, a small business may also be deemed an "SDB" for purposes of government contracting *without* participating in the Section 8(a) program.  *See, e.g.*, Small Disadvantaged Business Program, 73 Fed. Reg. at 57,491–92.  In other words, a small business must be an SDB to participate in the Section 8(a) program, but it need not participate in the program to be an SDB.

The dispute in the instant case centers on the statutory definition of "socially disadvantaged individuals."  Section 637 of Title 15 of the U.S. Code defines "[s]ocially disadvantaged individuals" as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities."  15 U.S.C. § 637(a)(5); *see also id.* § 631(f)(1)(B) (individuals may be "socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control").  Pursuant to the statute, "such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities[.]"  *Id.* § 631(f)(1)(C). Thus, the statute establishes "a rebuttable presumption" that members of these particular groups, and certain other groups, are "socially disadvantaged[,]" 13 C.F.R. § 124.103(b)(1), and if an individual business owner is not a member of a presumptively socially disadvantaged group, then he or she "must establish individual social disadvantage by a preponderance of the evidence[,]" *id.* § 124.103(c)(1).  *See also id.* § 124.103(c)(2) (explaining that sufficient "[e]vidence of individual social disadvantage" has several "elements[,]" including "[a]t least one objective distinguishing feature that has contributed to social disadvantage" and "[p]ersonal experiences of substantial and chronic social disadvantage in American society").

In addition to defining "socially disadvantaged individuals[,]" the statute also defines "[e]conomically disadvantaged individuals[.]"  15 U.S.C. § 637(a)(6)(A). These are "socially disadvantaged individuals whose ability to compete in the free

enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." *Id.* Factors that determine economically disadvantaged status include "income for the past three years[,] . . . personal net worth, and the fair market value of all assets, whether encumbered or not." 13 C.F.R. § 124.104(c). As explained, a small business that can demonstrate its ability to succeed and that is owned by an individual citizen of good character who is considered socially and economically disadvantaged within the statutory definitions is eligible to participate in the Section 8(a) program. *See id.* § 124.101.

The Section 8(a) program is but "one of a number of government-wide programs [that are] designed to encourage the issuance of procurement contracts to" certain small businesses, *DynaLantic*, 885 F. Supp. 2d at 244 (citing 15 U.S.C. § 644), including businesses that are owned by women, businesses that are owned by service-disabled veterans, and businesses that are located in historically underutilized business zones, known as "HUBZones." *See* 15 U.S.C. § 637(m) (establishing procurement program for woman-owned small businesses); *id.* § 657f (establishing procurement program for small businesses owned by service-disabled veterans); *id.* § 657a (establishing contracting assistance and procurement program for HUBZone small businesses). As part of the legislative scheme that governs the Section 8(a) business development program and similar programs directed toward developing opportunities for small businesses in America, Congress has specifically directed the President to "establish [annual] Government-wide goals for procurement contracts awarded to [various] small business concerns[.]" *Id.* § 644(g)(1)(A). With respect to SDBs in particular, Congress

has specified that the goal for participation "shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year." *Id.* § 644(g)(1)(A)(iv).[2]  The participation goals with respect to other small business programs are similar—*see, e.g.*, *id.* § 644(g)(1)(A)(v) ("not less than 5 percent" for woman-owned small businesses); *id.* § 644(g)(1)(A)(ii) ("not less than 3 percent" for small businesses owned by service-disabled veterans); *id.* § 644(g)(1)(A)(iii) ("not less than 3 percent" for HUBZone small businesses)—and all of the statutory targets are "aspirational" and not mandatory, *DynaLantic*, 885 F. Supp. 2d at 244 (quotation marks omitted).

### B. Rothe's Claim

Rothe is a Texas corporation that operates in the computer services industry and bids on and performs government procurement contracts on a nationwide basis.  (*See* Affidavit of Dale Patenaude ("Patenaude Aff."), Ex. 1 to Pl.'s Compl., ECF No. 1-1, at 3; *see also* Defs.' Statement of Material Facts & Resp. to Pl.'s SOF ("Defs.' SOF"), ECF No. 64-2, ¶ II.23; Pl.'s Resp. to Defs.' Statement of Material Facts ("Pl.'s SOF Resp."), ECF No. 68-1, ¶ I.1.)[3]  Rothe employs approximately 120 individuals (*see* Patenaude Aff. at 3), and it allegedly qualifies as a woman-owned small business under the Act and its accompanying regulations (*see id.*; Pl.'s SOF Resp. ¶ I.1).  According to Plaintiff, Rothe derives "[a]pproximately 85-90%" of its annual gross income from government contracts.  (Patenaude Aff. at 4; *see also* Pl.'s Statement of Material Facts

---

[2] This five percent goal relates to *all* SDBs, not just those that are Section 8(a) participants, and thus this figure includes, but is not limited to, procurement contracts awarded to Section 8(a) program participants.  *See DynaLantic*, 885 F. Supp. 2d at 244–45.

[3] Page numbers throughout this memorandum opinion—except for deposition page numbers—refer to those that the Court's electronic filing system assigns.

("Pl.'s SOF"), ECF No. 55-1, ¶ 24.)  Specifically, Rothe bids on and performs DOD and

military contracts that, for the most part, fit into one of the following five North

American Industry Classification System ("NAICS") codes:  Custom Computer

Programming Services (541511); Computer Systems Design Services (541512);

Computer Facilities Management Services (541513); Other Computer Related Services

(541519); and Facilities Support Services (561210).  (Patenaude Aff. at 3–4.)[4]  Rothe

does not participate in the Section 8(a) program and does not allege that it has ever

applied to the program or otherwise sought certification as an SDB.  (*See* Patenaude

Aff. at 2; Pl.'s SOF ¶ 18; *see also* Defs.' SOF ¶ II.18.)

Rothe filed the instant action against the DOD and the Small Business

Administration on May 9, 2012.  (*See* Compl.)  The gravamen of Rothe's complaint is

that the Section 8(a) program "prevents Rothe from bidding on [DOD] contracts" on the

basis of race in violation of Rothe's rights under the equal protection component of the

Due Process Clause of the Fifth Amendment (*id.* ¶ 2), and that the program is an

unconstitutional delegation of authority to the Small Business Administration "to make

or enact racial classifications" (*id.* ¶ 30).  Accordingly, Rothe seeks (1) a declaratory

judgment that the definition of "socially disadvantaged individuals" as set forth in the

---

[4] The NAICS code system "is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy."  U.S. Census Bureau, *North American Industry Classification System: Introduction to NAICS*, http://www.census.gov/eos/www/naics/index.html (last visited June 5, 2015).  It is a "2- through 6-digit hierarchical classification system," meaning that "[e]ach digit in the code is part of a series of progressively narrower categories, and the more digits in the code signify greater classification detail."  U.S. Census Bureau, *North American Industry Classification System: Frequently Asked Questions*, http://www.census.gov/eos/www/naics/faqs/faqs.html (last visited June 5, 2015).  In each code, "[t]he first two digits designate the economic sector, the third digit designates the subsector, the fourth digit designates the industry group, the fifth digit designates the NAICS industry, and the sixth digit designates the national industry."  *Id.*  Some federal agencies use NAICS codes in the course of awarding government contracts to small businesses.  *See, e.g.*, 15 U.S.C. § 644(a).

statutes pertaining to the Section 8(a) program is unconstitutional on its face (*see id.* ¶¶ 52–54); (2) a permanent injunction that prevents Defendants from using the "socially disadvantaged individuals" definition to exclude Rothe from bidding on contracts reserved for Section 8(a) participants (*see id.* ¶¶ 56–59); and (3) an award of reasonable attorneys' fees, costs, and expenses (*see id.* ¶¶ 61–64).

Notably, as mentioned earlier, the legal claims in Rothe's complaint are nearly identical to the facial constitutional claim in the second amended complaint that was filed in *DynaLantic Corp. v. Department of Defense*, a case that was pending in this district when Rothe's complaint was filed. *See* Second Am. Compl., DynaLantic v. Dep't of Defense, 885 F. Supp. 2d 237 (D.D.C. 2012) (No. 95-cv-2301) ("DynaLantic's Second Am. Compl."). Given the similarity of the two cases—and also the fact that the *DynaLantic* court considered and reached the merits of the constitutional claim—a brief description of the facts, circumstances, and holding of *DynaLantic* is warranted.

### C. *DynaLantic Corp. v. Department of Defense*

In *DynaLantic*, a small business that bid on and performed contracts and subcontracts in the military simulation and training industry—but that did not participate in the Section 8(a) program and was not an SDB—sued the DOD, the Small Business Administration, and the Department of the Navy alleging, *inter alia*, that the statutory provisions of Section 8(a) limiting certain contract awards to "small business concerns owned and controlled by 'socially and economically disadvantaged individuals'" were unconstitutional on their face and also as applied to the industry in which the plaintiff operated. DynaLantic's Second Am. Compl. ¶ 9; *see also DynaLantic*, 885 F. Supp. 2d at 246–47. Specifically, DynaLantic argued that the challenged provisions prevented it and other small businesses "from competing for

federal procurements . . . on the basis of race, thereby 'violat[ing] DynaLantic's rights under . . . the equal protection component of the Due Process Clause of the Fifth Amendment of the Constitution.'" *DynaLantic*, 885 F. Supp. 2d at 247 (second alteration in original) (quoting DynaLantic's Second Am. Compl. ¶ 23).  After extensive discovery, briefing, and submissions by amici, the Court (Sullivan, J.) granted summary judgment on the facial constitutional claim in favor of the government, and granted summary judgment on the as-applied claim to DynaLantic.  *See id.* at 248–83.

With respect to the applicable legal standards, the Court explained that to prevail on its facial constitutional claim DynaLantic would have to "'establish that no set of circumstances exist[ed] under which the [challenged provisions] would be valid.'" *Id.* at 249 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  Moreover, because constitutional validity in a particular circumstance turned on the application of strict scrutiny to the admittedly race-conscious provisions at issue, the government would have to show both the existence of a compelling governmental interest underlying the challenged provisions (supported by a strong basis in evidence that race-based remedial action was required to further such interest) and that the challenged provisions were narrowly tailored to achieve the articulated compelling interest.  *See id.* at 250–51.

The Court then engaged in a detailed examination of the challenged statutory provisions, the arguments of the parties and their amici, relevant precedent, and the extensive record evidence, including disparity studies on racial discrimination in federal contracting across various industries.  *See id.* at 251–80, 283–91.  Ultimately, the Court concluded "that Congress ha[d] a compelling interest in eliminating the roots of racial

discrimination in federal contracting, funded by federal money[,]" and also that the government "ha[d] established a strong basis in evidence to support its conclusion that remedial action was necessary to remedy that discrimination" insofar as it provided "extensive evidence of discriminatory barriers to minority business formation . . . [and] minority business development," as well as "significant evidence that, even when minority businesses are qualified and eligible to perform contracts in both the public and private sectors, they are awarded these contracts far less often than their similarly situated non-minority counterparts." *Id.* at 279.  The Court also found that DynaLantic had failed "to present credible, particularized evidence that undermined the government's compelling interest [or that] demonstrated that the government's evidence 'did not support an inference of prior discrimination and thus a remedial purpose.'" *Id.* (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 293 (1986) (O'Connor, J., concurring)).

With respect to narrow tailoring, the *DynaLantic* court considered several factors, including: "(1) the efficacy of alternative, race-neutral remedies, (2) flexibility, (3) over- or under-inclusiveness of the program, (4) duration, (5) the relationship between numerical goals and the relevant labor market, and (6) the impact of the remedy on third parties." *Id.* at 283 (citing *United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality and concurring opinions)).  Upon consideration of all of these factors, *see id.* at 283–91, the Court concluded that "the Section 8(a) program is narrowly tailored on its face[,]" *id.* at 291.  Consequently, because the government had demonstrated that Section 8(a)'s race-conscious provisions were narrowly tailored to further a compelling state interest, the Court held that strict scrutiny was satisfied in the

context of "the construction industry . . . [and] in other industries such as architecture and engineering, and professional services as well[,]" *id.* at 279–80, and because DynaLantic had thus failed to meet its burden to show that the challenged provisions were unconstitutional in all circumstances, the Court held that Section 8(a) was constitutional on its face and entered summary judgment on the facial constitutional claim in the government's favor, *see id.* at 293.[5]

The parties in *DynaLantic* cross-appealed to the United States Court of Appeals for the District of Columbia Circuit in October of 2012. *See* Defs.' Notice of Appeal, DynaLantic v. Dep't of Defense, 885 F. Supp. 2d 237 (D.D.C. 2012) (No. 95-cv-2301), ECF No. 252; Pl.'s Notice of Cross-Appeal, DynaLantic v. Dep't of Defense, 885 F. Supp. 2d 237 (D.D.C. 2012) (No. 95-cv-2301), ECF No. 254. On January 31, 2014, this Court stayed proceedings in the instant case pending resolution of the *DynaLantic* appeal. (*See* Order, Dec. 23, 2013, ECF No. 43, at 1.) However, on February 11, 2014, the parties in this matter notified this Court that the D.C. Circuit had dismissed *DynaLantic* after the parties in that case reached a settlement and withdrew their appeal. (*See* Joint Notice of Dismissal of *DynaLantic* & Status Report, ECF No. 47, at 1–2.)

**D. Procedural History**

As noted, Rothe filed its action challenging the facial constitutionality of the Section 8(a) program on May 9, 2012, while the *DynaLantic* case was still pending in

---

[5] The Court reached a different conclusion with respect to DynaLantic's as-applied challenge. Specifically, because "defendants concede[d] that they d[id] not have evidence of discrimination in [the military simulation and training] industry[,]" the Court concluded that "the government ha[d] not met its burden to show a compelling interest in remedying discrimination in [that] industry[.]" *DynaLantic*, 885 F. Supp. 2d at 280, 283. Consequently, the Court granted summary judgment in DynaLantic's favor on its as-applied challenge. *See id.* at 282 ("The fact that Section 8(a) is constitutional on its face . . . does not give the [government] carte blanche to apply it without reference to the limits of strict scrutiny. Rather, agencies have a responsibility to decide if there has been a history of discrimination in the particular industry at issue[.]").

the district court—both actions were treated as related cases and assigned to the same district judge.  That judge permitted discovery to proceed in the instant matter at the parties' urging (*see* Scheduling Order, Sept. 18, 2012, ECF No. 23, at 2; *see also* Pl.'s Suppl. Resp. to the Court's Minute Orders & Scheduling Recommendations, ECF No. 21, at 4; Defs.' Suppl. Resp. to the Court's Minute Orders & Scheduling Recommendations, ECF No. 22, at 5), and discovery continued even after the *DynaLantic* opinion upholding the facial constitutionality of the Section 8(a) program issued.  The instant action was transferred to the undersigned on April 5, 2013, while discovery was still underway.  (*See* Minute Entry, Apr. 5, 2013; *see also* Am. Scheduling Order, ECF No. 24, at 2; Minute Order, Dec. 18, 2012 (extending discovery period); Minute Order, Mar. 25, 2013 (same).)

During the discovery period, the parties prepared and exchanged expert reports regarding evidence of discrimination in government contracting.  Defendants retained two experts, who testified, broadly speaking, that socially disadvantaged and minority-owned small businesses are significantly less likely, statistically, to win government contracts than their non-minority and non-SDB counterparts (*see* Report of Defs.' Expert Robert N. Rubinovitz ("Rubinovitz Report"), ECF No. 44-3, at 12; Additional Analysis by Dr. Robert Rubinovitz ("Rubinovitz Suppl. Report"), ECF No. 44-4, at 2), and that minority-owned businesses across the country are substantially underutilized in government contracting—a phenomenon that, according to these experts, cannot be explained by nondiscriminatory factors (*see* Report of Defs.' Expert Jon Wainwright ("Wainwright Report"), ECF No. 46-3, at 27, 97).  Plaintiff also engaged two experts, and Plaintiff's experts maintained that Defendants' experts' conclusions were incorrect

largely because their data and methods were flawed.  (*See, e.g.*, Report of Pl.'s Expert Dale Patenaude ("Patenaude Report"), ECF No. 49-2, at 2; Report of Pl.'s Expert John Charles Sullivan ("Sullivan Report"), ECF No. 49-4, at 11–12, 23–37.)

A series of *Daubert* motions followed: specifically, Rothe filed a single motion to exclude or limit the testimony of Defendants' experts Robert Rubinovitz and Jon Wainright (*see* Pl.'s Mot. to Exclude or Limit Test. of Defs.' Experts & Mem. in Supp. ("Pl.'s *Daubert* Br."), ECF No. 45) on the grounds that their testimony is both unreliable and irrelevant to the factual matters at hand.  Defendants filed two separate motions to exclude the reports and testimony of Plaintiff's experts Dale Patenaude and John Charles Sullivan.  (*See* Defs.' Mot. in Limine to Exclude the Expert Reports & Test. of Pl.'s Expert Dale Patenaude ("Defs.' Patenaude *Daubert* Mot."), ECF No. 44; Defs.' Mot. in Limine to Exclude the Testimony and Ops. of Pl.'s Expert John Charles Sullivan, Esq. ("Defs.' Sullivan *Daubert* Mot."), ECF No. 46.)  In essence, Defendants contend that Plaintiff's experts are not qualified to testify as experts and that their proffered testimony is unreliable.  (*See* Defs.' Mem. in Supp. of Defs.' Patenaude *Daubert* Mot. ("Defs.' Patenaude *Daubert* Br."), ECF No. 44-1, at 9–19; Defs.' Mem. in Supp. of Defs.' Sullivan *Daubert* Mot. ("Defs.' Sullivan *Daubert* Br."), ECF No. 46-1, at 9–20.)

Rothe then filed a motion for summary judgment with respect to its claim that the definition of "socially disadvantaged individual" as it appears in the Act and is used in the context of administering the Section 8(a) program is unconstitutional on its face. (*See* Pl.'s Mot. for Summ. J., ECF No. 55.)  Rothe's motion argues, first, that Section 8(a)'s definition of socially disadvantaged individuals "is unconstitutional racial

balancing, for which there is no compelling interest, and for which narrow tailoring is impossible"; and second, that the definition violates the nondelegation doctrine insofar as it "lack[s] any intelligible principle to limit the Executive's discretion in deciding whether racial, ethnic or cultural bias has occurred or even what constitutes a racial, ethnic, or cultural group." (Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s MSJ Br."), ECF No. 56, at 7.)

Defendants responded by filing a cross-motion for summary judgment (Defs.' Cross-Mot. for Summ. J., ECF No. 64), in which Defendants maintain that "Rothe's facial challenge is identical to that brought and rejected in *DynaLantic* . . . and fails for the same reasons" (Defs.' Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. & Resp. to Pl.'s Mot. for Summ. J. ("Defs.' MSJ Br. & Resp."), ECF No. 64-1, at 13). Specifically, Defendants assert that (1) the government has a compelling "interest in 'breaking down barriers to minority business development created by discrimination and its lingering effects'" (*id.* (quoting *DynaLantic*, 885 F. Supp. 2d at 251)); (2) there is "a 'strong basis in evidence to support [the government's] conclusion that remedial action was necessary'" to further that interest (*id.* (quoting *DynaLantic*, 885 F. Supp. 2d at 279)); and (3) the statute is narrowly tailored and "designed to minimize the burden on non-minority firms" (*id.* at 14 (citing *DynaLantic*, 885 F. Supp. 2d at 290)). Defendants also argue that the Section 8(a) program conforms to the nondelegation doctrine because the statute defines "socially disadvantaged individuals" and sets forth Congress' relevant findings, and it also articulates the policies underlying the program—all of which serve to guide the Small Business Administration in implementing the program. (*See id.* at 90.)

This Court held a hearing on the parties' *Daubert* and cross summary judgment motions on October 20, 2014.

## II.   DAUBERT MOTIONS

This Court will address the parties' *Daubert* arguments first, because "[i]f the Court finds [an expert's] opinions to be clearly unreliable, it may disregard his reports in deciding whether plaintiffs have created a genuine issue of material fact." *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 35 (D.D.C. 2004) (citing *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000)); *see also Lewis v. Booz-Allen & Hamilton, Inc.*, 150 F. Supp. 2d 81, 84 (D.D.C. 2001) (addressing evidentiary motions first, "[s]ince a motion for summary judgment requires an examination of the entire record, including all pleadings and all admissible evidence").

As concerns Defendants' experts, Rothe contends that Rubinovitz's and Wainwright's testimony is irrelevant because it has not been submitted to Congress (*see* Pl.'s *Daubert* Br. at 4), and that it contains both inadmissible legal conclusions—such as whether the strong basis in evidence requirement has been met (*see id.* at 10, 12)— and unreliable opinions regarding statistical facts (*see id.* at 16–17 (arguing that Defendants' experts have analyzed contracting data using fewer than all six-digits of only some NAICS codes such that not every industry and subsector is captured)).  For their part, Defendants contend that neither Patenaude nor Sullivan qualifies as an expert in any field of scientific knowledge that is pertinent to the instant case (*see* Defs.' Patenaude *Daubert* Br. at 9–12; Defs.' Sullivan *Daubert* Br at 9–14), and that Patenaude's and Sullivan's testimony is unreliable because both experts rely on inaccurate data and employ methods in their critiques of Rubinovitz and Wainwright that are speculative and scientifically unproven (*see* Defs.' Patenaude *Daubert* Br. at

12–19; Defs.' Sullivan *Daubert* Br. at 14–20).  Defendants further contend that Sullivan's testimony contains impermissible legal opinions, such as whether the disparity studies at issue are legally sufficient to justify the Section 8(a) program.  (*See* Defs.' Sullivan *Daubert* Br. at 20.)

For the reasons that follow, this Court finds that Rubinovitz's and Wainwright's expert reports are reliable and potentially helpful to the trier of fact, and thus properly admitted, while Patenaude's and Sullivan's testimony fails to conform with the applicable legal standards related to expert qualifications and reliability, and therefore must be excluded.

## A. Legal Standard For Admitting Expert Evidence

Federal Rule of Evidence 702 governs the admissibility of expert evidence.  It provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 "imposes a special obligation on a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (alteration in original) (quoting *Daubert*, 509 U.S. at 589).  Thus, federal courts have a "basic gatekeeping obligation" with respect to expert testimony.  *Id.*

Rule 702 requires that an expert be qualified to testify on the basis of "knowledge, skill, experience, training, or education[,]" and thus encompasses "not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values." Fed. R. Evid. 702 advisory committee's note (1972) (internal quotation marks and citation omitted). While "a person who holds a graduate degree typically qualifies as an expert in his or her field[,]" *Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 11 (D.D.C. 2011), such formal education is not required and "an expert may still be qualified on the basis of his or her practical experience or training[,]" *Robinson v. District of Columbia*, No. 09-cv-2294, 2014 WL 6778330, at *4 (D.D.C. Dec. 2, 2014). However, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000). Regardless of the basis on which a witness purports to qualify as an expert, as part of its gatekeeping function the court must assess whether a proposed expert possesses "a reliable basis in the knowledge and experience of [the relevant] discipline." *Daubert*, 509 U.S. at 592.

Once the court is satisfied that the witness is an expert within the meaning of Rule 702, "[u]nder *Daubert* the district court is required to address two questions, first whether the expert's testimony is based on 'scientific knowledge,' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1126 (D.C. Cir. 2001) (quoting *Daubert*,

509 U.S. at 592).  With respect to the first prong, "the district court's focus is on the methodology or reasoning employed." *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996).  Specifically, the court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93; *see also Ambrosini*, 101 F.3d at 133 ("'In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.'" (quoting *Daubert*, 509 U.S. at 590)).

There are several factors that courts typically consider in making a scientific validity determination: "(1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the method's known or potential rate of error; and (4) whether the theory or technique finds general acceptance in the relevant scientific community." *Ambrosini*, 101 F.3d at 134 (citing *Daubert*, 509 U.S. at 593–94.)  This "inquiry is a 'flexible one,' no one factor is dispositive, and the four-factor list is not exhaustive." *United States v. Machado-Erazo*, 950 F. Supp. 2d 49, 52 (D.D.C. 2013) (internal quotation marks and citation omitted).  Moreover, whatever factors a court considers, "[t]he trial judge in all cases of proffered expert testimony must find that [the testimony] is properly grounded, well-reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702 advisory committee's note (2000).

The second *Daubert* prong relates to relevance and is fairly straightforward.  *See Ambrosini*, 101 F.3d at 134 (citing *Daubert*, 509 U.S. at 593–94).  "The district court must determine whether the proffered expert testimony 'is sufficiently tied to the facts

of the case that it will aid the [factfinder] in resolving a factual dispute.'"  *Id.* (quoting

*Daubert*, 509 U.S. at 591).   Where, as here, a party moves to exclude expert testimony,

"[t]he party seeking to introduce expert testimony must demonstrate its admissibility by

a preponderance of the evidence."  *Harris v. Koenig*, 815 F. Supp. 2d 6, 8 (D.D.C.

2011) (citing *Daubert*, 509 U.S. at 592 n.10).   "The presumption under the Rules is that

expert testimony is admissible once a proponent makes the requisite threshold showing;

further disputes go to weight, not admissibility."  *Machado-Erazo*, 950 F. Supp. 2d

at 52.

### B.  The Proffered Expert Evidence In The Instant Case

   1. <u>Rubinovitz's Testimony Is Reliable, Relevant, And Admissible</u>

   Robert Rubinovitz holds a Ph.D. in economics from the Massachusetts Institute

of Technology and currently serves as the Deputy Chief Economist at the United States

Department of Commerce.  (*See* Rubinovitz Report at 2.)  Using regression analysis,

Rubinovitz claims to have isolated the effect of minority ownership on the likelihood of

a small business receiving government contracts.  (*See id.* at 10–12; *see also* Rubinovitz

Suppl. Report at 2.)[6]  Specifically, Rubinovitz used a "logit model" (Rubinovitz Report

at 10), to examine government contracting data for fiscal year 2012 that he collected

from the General Services Administration's System for Award Management, the Federal

Procurement Data System, the Small Business Administration, and other public and

private sources (*see id.* at 4–9 (discussing sources)), in order to determine "whether the

data show any difference in the odds of contracts being won by minority-owned small

---

[6] Regression analysis is a widely accepted statistical tool and a common evidentiary feature in federal
courts, particularly in the context of discrimination cases.  *See, e.g.*, *Bazemore v. Friday*, 478 U.S. 385,
400–01 (1986) (discussing admissibility of regression analyses in Title VII cases).

businesses, particularly those identified as SDBs and those that are part of the 8(a)

program, relative to other small businesses" (*id.* at 10).  Rubinovitz controlled for other

variables that could "influence the odds of whether or not a given firm wins a contract"

(*id.* at 11)—such as business size, age, and level of security clearance (*see id.*)—and

concluded that "the odds of minority-owned small firms and non-8(a) SDB firms

winning contracts were lower than small non-minority and non-SDB firms" (*id.* at 12).

In particular, "the odds of an SDB firm winning a contract is roughly 11 percent lower

than other types of small businesses, while small minority-owned firms, regardless of

whether they are SDBs or in the 8(a) program, had roughly 30 percent lower odds of

winning a contract than other firms." (*Id.*)  In addition, Rubinovitz found that "non-

8(a) minority-owned SDBs are statistically significantly less likely to win a contract in

industries accounting for 94.0% of contract actions, 93.0% of dollars awarded, and in

which 92.2% of non-8(a) minority-owned SDBs are registered[,]" and that "[t]here is no

industry where non-8(a) minority owned SDBs have a statistically significant advantage

in terms of winning a contract from the federal government."  (Rubinovitz Suppl.

Report at 2.)  This Court has considered Rothe's objections to Rubinovitz's testimony,

and concludes that the testimony is fully admissible under Rule 702.

First of all, Rubinovitz's qualifications to testify as an expert are undisputed (*see*

Hr'g Tr. at 17:18–18:1 (Plaintiff's counsel conceding that Defendants' experts are

qualified)), and this Court finds that Rubinovitz is, indeed, qualified "by knowledge,

skill, experience, training, [and] education[,]" Fed. R. Evid. 702.  As for the reliability

of Rubinovitz's testimony, this Court rejects Rothe's contention that Rubinovitz's

expert opinion is based on insufficient data, *i.e.*, that his analysis of data related to a

subset of the relevant industry codes is too narrow to support his scientific conclusions. (*See, e.g.*, Pl.'s *Daubert* Br. at 16–17.)  It is well established that a court may not exclude an expert's otherwise reliable and relevant testimony simply because, without more, the testimony is insufficient to prove a proponent's *entire* case.  *See, e.g.*, *McReynolds*, 349 F. Supp. 2d at 35 ("'[T]he question before [the Court] is not whether the reports proffered by plaintiffs prove the entire case; it is whether they were prepared in a reliable and statistically sound way, such that they contained relevant evidence that a trier of fact would have been entitled to consider.'" (second alteration in original) (quoting *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000))).

Moreover, Rubinovitz specifically addresses Rothe's critique about his data set, explaining that, from a mathematical perspective, excluding certain NAICS codes and analyzing data at the three-digit level actually *increases* the reliability of his results. For example, because "NAICS is a hierarchical classification system" and "industry classifications become more narrowly defined—and more sparsely populated" as "more digits are added to the code," Rubinovitz explains that he opted to "use codes at the three-digit level as a compromise[,] balancing the need to have sufficient data in each industry grouping and the recognition that many firms can switch production within the broader three-digit category."  (Rubinovitz Report at 5.)  Rubinovitz also excluded "[c]ertain NAICS industry groups" from his regression analyses "because of incomplete data, irrelevance, or because data issues in a given NAICS group prevented the regression model from producing reliable estimates[.]"  (*Id.* at 7; *see also id.* at 8 (listing NAICS codes not included in analyses).)  This Court finds that Rubinovitz's reasoning with respect to the exclusions and assumptions he makes in the analysis are

fully explained and scientifically sound; thus, his exclusions are not a valid basis for concluding that his expert testimony is unreliable.  *Cf. Daubert*, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known.").

Rothe also contends that, even if Rubinovitz's testimony is reliable, it should be deemed irrelevant to this Court's assessment of Section 8(a)'s constitutionality because it is *new* evidence, in the sense that Rubinovitz's testimony was not before Congress at the time it enacted or reauthorized Section 8(a).  (*See* Pl.'s *Daubert* Br. at 4 ("The law is now very clear that post-reauthorization evidence is precluded and that experts are neither required for, nor relevant to, the required causal relationships between the alleged data before Congress and the statutory racial classification that Congress enacted." (citing *Rothe Dev. Corp. v. Dep't of Defense*, 545 F.3d 1023, 1031, 1040–41 (Fed. Cir. 2008)))).)  The issue of the relevance of post-enactment evidence is one that has been raised repeatedly in the context of constitutional challenges to federal statutes, *see, e.g.*, *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1166 (10th Cir. 2000); *Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 911–12 (11th Cir. 1997); *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 1003–04 (3d Cir. 1993), and "nearly every circuit to consider this question has held that reviewing courts" need *not* limit themselves to the particular evidence that Congress relied upon when it enacted the statute at issue, *DynaLantic*, 885 F. Supp. 2d at 257. Thus, although Rothe is correct to point out that, where Congress "makes [a] racial distinction [it] must have had a strong basis in evidence to conclude that remedial action was necessary *before* it embarks on an affirmative action program[,]" *Shaw v.*

*Hunt*, 517 U.S. 899, 910 (1996) (emphasis in original) (internal quotation marks and

citation omitted); (*see also* Pl.'s MSJ Br. at 15), this statement of the Supreme Court

does not mean that post-enactment evidence is irrelevant to constitutional review;

indeed, as the *DynaLantic* court concluded, "[p]ost-enactment evidence is particularly

relevant when, as here, the statute is over thirty years old and the evidence used to

justify Section 8(a) is stale for purposes of determining a compelling interest in the

present[,]" *DynaLantic*, 885 F. Supp. 2d at 258.  This Court agrees, and it too concludes

that Rothe's post-enactment relevance argument is rendered even less persuasive given

the fact that the Act requires the Small Business Administration to "report annually to

Congress on the status of small disadvantaged businesses generally and the Section 8(a)

program in particular[,]" and "thus, the statute itself contemplates that Congress will

review the 8(a) program on a continuing basis."  *Id.*[7]

This Court also disagrees with Rothe's assertion that Rubinovitz's testimony

should be excluded as irrelevant because it contains an inadmissible legal conclusion.

(*See* Pl.'s *Daubert* Br. at 12.)  Rothe points to an excerpt from Rubinovitz's deposition

where Rubinovitz was asked if the results of his analyses are "consistent with a finding

that SDBs face discrimination" (*id.* (citation omitted)), and Rubinovitz answered in the

affirmative—"[i]t would be consistent with that finding, yes" (*id.* (citation omitted)).

Rothe insists that such testimony "cannot properly assist the trier of fact" in

_____

[7] The Supreme Court's opinion in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), which struck down the Voting Rights Act's formula for selecting jurisdictions subject to preclearance procedures, is not to the contrary.  In *Shelby County*, the Supreme Court found that Congress reverse-engineered the formula to cover particular jurisdictions rather than base the formula on compiled record evidence, *Shelby County*, 133 S. Ct. at 2629, and the Court did not even *discuss*, much less rule upon, the issue of the admissibility of post-enactment evidence.  Consequently, Rothe's reliance on *Shelby County* in this context is misplaced.  (*See, e.g.*, Pl.'s MSJ Br. at 16 ("The *Shelby County* case reversed and clearly rejected the approval of post-enactment evidence by the D.C. Circuit Court of Appeals.").)

understanding the evidence or determining facts in issue and thus is not relevant under *Daubert*. (*Id.* at 2); *see also Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997). But it is clear beyond cavil that an expert may give "his 'opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied[.]'" *Kapche v. Holder*, 677 F.3d 454, 464 (D.C. Cir. 2012) (quoting *Burkhart*, 112 F.3d at 1212–13). And Rothe has not demonstrated that Rubinovitz did anything more than that here. That is, Rubinovitz was not asked directly to state his opinion on the legal issue—*i.e.*, whether SDBs face discrimination sufficient to justify race-based remedial action—but instead, the carefully-worded question asked Rubinovitz to opine as to whether *the results of his analysis* were "consistent" (or, presumably, inconsistent) with the presence of discrimination. (Pl.'s *Daubert* Br. at 12 (citation omitted).) In the absence of any binding precedents that cast doubt on the admissibility of Rubinovitz's answer, this Court finds that Rubinovitz's testimony is relevant insofar as it will assist the factfinder in determining whether the data presented shows that the applicable legal standards in this case have been met.

In sum, Rubinovitz qualifies as an expert, and his testimony is both reliable and relevant. Therefore, this Court will admit and consider Rubinovitz's expert testimony when evaluating the parties' cross-motions for summary judgment.

2. Wainwright's Testimony Is Reliable, Relevant, And Admissible

Defendants' second expert witness, Jon Wainwright, is a senior vice president at NERA Economic Consulting and holds a Ph.D. in economics from the University of Texas at Austin. (*See* Wainwright Report at 7.) Wainwright represents that he has "served as the project director and principal investigator for more than 30 studies of business discrimination" (*id.*), and he has also testified before Congress regarding

business discrimination on several occasions (*see id.* at 8).  Wainwright's report in the instant case primarily concerns disparity studies, which are studies designed to measure the availability and utilization of minority-owned businesses ("MBEs") in government contracting.  (*See id.* at 13 ("A disparity analysis of public spending is simply a comparison of MBE utilization to MBE availability in various categories of contracting relevant to a given agency.").)  Wainwright reviewed the results of 107 studies conducted since the year 2000, all but 32 of which were submitted to Congress.  (*See id.* at 16.)  Specifically, Wainwright examined the disparity indexes for these studies, which he calculated "by dividing the respective MBE utilization percentage by its associated MBE availability percentage, and multiplying the result by 100."  (*Id.* at 28.)  In his expert report, Wainwright explains that "[a] disparity index of 100 or more indicates that MBEs are being utilized at or above their estimated availability level[,]" while "[a] disparity index of less than 100 indicates that MBEs are being utilized below their estimated availability level."  (*Id.*)  Significantly for present purposes, Wainwright states that "[a] disparity index of 80 or lower is commonly taken as a strong indicator that discrimination is adversely affecting MBEs."  (*Id.* (citing 29 C.F.R. § 1607.4(d)).)  In Wainwright's opinion, the disparity studies he examined share a "widespread finding of substantial underutilization of MBEs throughout the United States" across several industries.  (*Id.* at 27.)

This Court has considered the proffered expert testimony and the relevant admissibility factors and finds that Wainwright's testimony is admissible.  Rothe does not contest that Wainwright is qualified to testify as an expert (*see* Hr'g Tr. at 17:18–18:1), and Defendants have demonstrated that Wainwright's testimony is both reliable

and relevant.  In particular, Wainwright's clearly-explained methodology appears to be scientifically valid, and his testimony regarding such a large body of record evidence will assist the factfinder in determining whether the data shows that the applicable legal standards in this case have been satisfied.  *See Ambrosini*, 101 F.3d at 134.

Rothe's arguments to the contrary largely mirror the arguments Rothe makes in attacking Rubinovitz's testimony, and are similarly unpersuasive.  For instance, Rothe once again contends that post-enactment evidence is inadmissible *per se*.  (*See, e.g.*, Pl.'s *Daubert* Br. at 4 ("The reports—and thus the testimony—of Defendants' experts were never placed before or considered by Congress, which renders them irrelevant as a matter of United States Constitutional law, and therefore inadmissible under [the] Federal Rules of Evidence[.]" (citations omitted)).)  As explained above, this Court rejects Rothe's argument against post-enactment evidence and adopts instead the *DynaLantic* court's holding that such evidence is not only admissible but also particularly relevant in the circumstances presented here.  *See DynaLantic*, 885 F. Supp. 2d at 258.  Consequently, this Court also rejects Rothe's argument that, to the extent that Wainwright's expert "report mixes disparity studies that were allegedly before Congress with ones that were not[,]" Wainwright's testimony is unreliable and inadmissible.  (Pl.'s *Daubert* Br. at 15.)

Rothe further maintains that Wainwright's testimony is inadmissible because "the final paragraph of Mr. Wainwright's report is a legal conclusion."  (*Id.* at 10; *see also id.* ("The Wainwright report, at best, is ultimately the same legal conclusion the *Dynalantic* court drew[.]").)  In that paragraph, Wainwright concludes that (1) "the studies submitted to Congress, taken as a whole, provide strong evidence of large,

adverse, and often statistically significant disparities between minority participation in business enterprise activity and the availability of those businesses"; (2) "these disparities are not explained solely, or even largely, by differences in factors other than race and sex that are untainted by discrimination"; and (3) "these disparities therefore are consistent with the presence [of] discrimination in the business market." (Wainwright Report at 97.)  Contrary to Rothe's assertion, Wainwright is not testifying that Section 8(a) survives strict scrutiny; instead, he is offering his expert opinion about what, if anything, the studies he examined demonstrate.  (*See, e.g.*, *id.* at 7 (explaining that the studies "contain significant evidence of large and adverse disparities facing minority business enterprises" and that such disparities "are consistent with the presence of discrimination and its lingering effects in the small business contracting environment").)  Even setting aside the fact that the appropriate remedy for an alleged statement of legal opinion is to exclude only that particular portion of testimony, *see, e.g.*, *Halcomb v. Wash. Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 27 (D.D.C. 2007) (excluding expert's opinions only "to the extent that they are phrased in terms of inadequately explored legal criteria or otherwise tell the [trier of fact] what result to reach" (internal quotation marks and citation omitted)), Wainwright's "opinion[s] as to facts that, if found, would support a conclusion that the legal standard at issue [has been] satisfied" may be admitted as expert testimony when all other requirements for admissibility are met, as explained above, *Kapche*, 677 F.3d at 464 (internal quotation marks and citation omitted).

Finally, Rothe argues that Wainwright's testimony is unreliable because of alleged flaws in the disparity studies that form the basis of Wainwright's expert report.

(*See* Pl.'s *Daubert* Br. at 13–14.)  Specifically, Rothe asserts that "the disparity studies do not all classify the same industries in the same way" (*id.* at 13), and that "[n]o collective inference can be drawn when the same industries are placed in different industry groups in different studies" (*id.* at 14).  But even if Rothe's contentions are correct, an attack on the underlying disparity studies does not necessitate the remedy of exclusion; rather, it is clear that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible [scientific] evidence." *Daubert*, 509 U.S. at 596; *see also Boyar v. Korean Air Lines Co.*, 954 F. Supp. 4, 7 (D.D.C. 1996) ("[I]t is not proper for the Court to exclude expert testimony merely because the factual bases for an expert's opinion are weak." (internal quotation marks and citation omitted)).  In its gatekeeping function, this Court must be focused solely on the reliability and relevance of the testimony that an expert witness proffers, and it is up to the factfinder "to determine whether [an expert's] opinions are suspect because facts upon which he relied were shown to be inaccurate or unproven." *SEC v. Johnson*, 525 F. Supp. 2d 70, 76 (D.D.C. 2007) (footnote omitted).

Accordingly, this Court concludes that Wainwright's expert testimony is admissible evidence, and the Court will consider it when assessing the pending cross-motions for summary judgment.

### 3. Patenaude Is Not Qualified To Testify As A Rebuttal Expert Here

Rothe's first expert witness, Dale Patenaude, is the vice president of Rothe and the husband of Rothe's president, Suzanne Patenaude.  (*See* Patenaude Report at 2; Patenaude Aff. at 2.)  Patenaude holds an undergraduate degree in electrical engineering from the University of Texas at Austin and has worked in government contracting—at

Rothe—since 1972.  (*See* Patenaude Report at 2.)  "During that time[,]" Patenaude states, "it has been [his] job, avocation and passion to review and analyze . . . data on small and small disadvantaged businesses for the purpose of knowing where contracts were being distributed in order to better understand the bid process for federal government contracts[.]"  (*Id.*)  Patenaude also states that he "operate[s] [his] own consulting business that provides this same type of econometric analysis consulting to other businesses to improve their business and bidding efficiencies."  (*Id.*)

Rothe offers Patenaude's testimony "as a response to the errors and omissions in the reports served by Defendants[.]"  (Pl.'s Resp. to Defs.' *Daubert* Mots. ("Pl.'s *Daubert* Resp."), ECF No. 49, at 1.)  However, it is undisputed that Patenaude does not have any formal education or training in statistical or econometric analysis (*see* Dep. of Dale Patenaude ("Patenaude Dep."), ECF No. 44-9, at 34:3–11), and he has never worked with regression models prior to this case (*id.* at 45:12–14).  Thus, Patenaude purports to refute Rubinovitz's testimony "by using basic addition, subtraction, multiplication, and division[.]"  (Pl.'s *Daubert* Resp. at 2.)  Moreover, Patenaude's report does not address the statistical significance of any of his calculations.  (*See* Patenaude Dep. at 50:3–7 ("I didn't do any statistics that required computation of statistical significance.  Mine were 100 percent significant because they weren't statistics."); *see also id.* at 16:4–6 (conceding that Patenaude "can't really explain" "how statistical significance is computed").)

Based on Patenaude's own admissions regarding his lack of training, education, knowledge, skill, and experience in any statistical or econometric methodology, Patenaude is plainly unqualified to testify as an expert with respect to Rubinovitz's or

Wainwright's reports.  *See, e.g.*, *Arias v. DynCorp*, 928 F. Supp. 2d 10, 17 (D.D.C.

2013) (finding expert was not qualified under Rule 702, notwithstanding expert's

"impressive credentials," because "plaintiffs [did] not demonstrate[] how [expert's]

academic and professional experiences ma[d]e him qualified to testify" about the

particular factual questions at issue); *Sykes v. Napolitano*, 634 F. Supp. 2d 1, 8 (D.D.C.

2009) (finding purported expert was not qualified under Rule 702 where expert did "not

offer 'expert' testimony based on his years of experience" but "[i]nstead . . . decide[d]

credibility on an incomplete written record, offer[ed] conclusions that have no basis in

fact revealed from his report, and advocate[d] for the Plaintiff rather than providing

expertise to the fact-finder").  It is also apparent that, even if Patenaude did have the

required skill and training to testify as an expert, Rothe has not shown that Patenaude's

testimony here employs "the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field[,]" *Kumho Tire Co.*, 526 U.S. at 152, and thus

his testimony is also unreliable.  Consequently, Patenaude's expert testimony in the

instant case is inadmissible, and this Court will exclude his expert report in its entirety.[8]

    4. Sullivan's Testimony Is Unreliable And Inadmissible

    Rothe's second expert witness, John Sullivan, holds a J.D. from the University of

Maryland Law School and an undergraduate degree in English and writing from Loyola

College in Baltimore, Maryland.  (*See* Sullivan Report at 50; Dep. of John Charles

Sullivan ("Sullivan Dep."), ECF No. 46-9, at 10:8–21.)  Sullivan has published various

---

[8] This does not mean, of course, that Patenaude is disqualified from testifying to facts within his personal knowledge and experience, as a lay witness. *See* Fed. R. Evid. 602.  Thus, this Court has considered and relied upon the representations of fact regarding such matters as the scope of Rothe's business that are included in the Patenaude affidavit that Plaintiff submitted in conjunction with its Complaint.

articles on affirmative action and government contracting (*see* Sullivan Report at 51), has worked on several disparity studies with his colleague George LaNoue (*see id.*; *see also* Sullivan Dep. at 15:21–16:1 (explaining that Sullivan and LaNoue "worked in tandem")), and has also testified before Congress regarding a particular disparity study that the Commerce Department conducted in 1998 (*see* Sullivan Report at 53). Sullivan acknowledges that he is neither an economist nor a statistician, and that he does not hold a degree in either field. (*See* Sullivan Dep. at 9:16–10:1.)

In the proffered expert report, Sullivan purports to "apply [his] extensive experience and research in the field of disparity studies to examine the record offered by the government to support its 8(a) program." (Sullivan Report at 5.) Specifically, Sullivan criticizes the vast majority of disparity studies analyzed in Wainwright's report for, *inter alia*, examining state and local—as opposed to federal—contracting (*see id.* at 3), for utilizing census data (*see id.* at 7, 11–13), and for relying on otherwise "stale" information (*id.* at 13). Sullivan also repeats Rothe's arguments against post-enactment evidence and against analyzing NAICS codes at anything less than the 6-digit level. (*See id.* at 6 ("Studies that are not before Congress cannot be used to justify a Congressional program."); *id.* at 4 ("The proper level of analysis should be the precise six digit NAICS level[.]").) Ultimately, Sullivan concludes that the record in the instant case "while hefty, is not sufficient. It does not justify the racial preferences of the [Small Business Administration]'s 8(a) program." (*Id.* at 48.)

This Court finds that, even assuming that Sullivan is qualified to testify as an expert on disparity studies based on his experience, Rothe has failed to demonstrate by a preponderance of the evidence that Sullivan's testimony is reliable. *See Heller v.*

*District of Columbia*, 952 F. Supp. 2d 133, 141 (D.D.C. 2013) ("'[T]he unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express[.]'" (quoting *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (emphasis in original))).  Sullivan's preferred methodology for conducting disparity studies—including his assertion that the only proper way to determine the availability of minority-owned businesses is to count those contractors and subcontractors that actually perform or bid on contracts (*see* Sullivan Report at 33)—appears to be well outside of the mainstream in this particular field.  (*See, e.g.*, Sullivan Dep. at 94:22–95:9 (Sullivan recalls only one disparity study he has ever encountered that he "felt was done properly")); *see also Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 9 (D.D.C. 2002) (explaining that expert testimony may be "unreliable when an expert chooses to utilize her own unique methodology rather than the proper analysis which is well-known and respected" (citations omitted)).  Moreover, Sullivan acknowledged during his deposition that portions of his report were based either on mistaken assumptions (*see* Sullivan Dep. at 38:20–39:13 (retracting certain opinions because Sullivan "misunderstood" Wainwright's testimony)) or on speculation (*see id.* at 42:21–43:11 (admitting that he "did not do any math" and was "speculating" when he concluded that the availability percentages in certain disparity studies were "'likely overstated'")).  And Rothe has not shown that Sullivan's critique of Wainwright's testimony is otherwise reliable.  *See Romero v. ITW Food Equip. Grp., LLC*, 987 F. Supp. 2d 93, 105–06 (D.D.C. 2013) (excluding expert testimony based on speculation as unreliable).

Therefore, this Court cannot find that Sullivan's proffered testimony "is properly grounded, well-reasoned, and not speculative[.]" Fed. R. Evid. 702 advisory committee's note (2000); *see also Heller*, 952 F. Supp. 2d at 140 ("The trial judge has 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" (quoting *Kumho Tire Co.*, 526 U.S. at 152)); *Groobert*, 219 F. Supp. 2d at 8 ("General acceptance in the community is an important factor in evaluating an expert's methodology and courts particularly emphasize this *Daubert* factor when reliability focuses on experience." (citing *Kumho Tire Co.*, 526 U.S. at 158)); *Ambrosini*, 101 F.3d at 134 ("[T]he *Daubert* analysis . . . focuses on the court's 'gatekeeper' role as a check on 'subjective belief' and 'unsupported speculation.'" (quoting *Daubert*, 509 U.S. at 590)).

Consequently, this Court will exclude Sullivan's testimony from its consideration of the parties' cross-motions for summary judgment.

## III.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

The plaintiff in *DynaLantic* asserted (as Rothe does here) that the race conscious provisions of Section 8(a) rendered the statute unconstitutional on its face, and the *DynaLantic* court fully and thoroughly analyzed the plaintiff's legal position. *See DynaLantic*, 885 F. Supp. 2d at 251–80, 283–91. Although not binding on this Court, *DynaLantic* is persuasive recent precedent from this district, and inasmuch as Rothe seeks to re-litigate the legal issues presented in that case, this Court declines Rothe's invitation to depart from the *DynaLantic* court's conclusion that Section 8(a) is constitutional on its face. This Court also finds that Rothe has failed to show that there is any genuine issue of material fact with respect to whether the Section 8(a) program

violates the nondelegation doctrine, as explained below; thus, this Court concludes that Defendants are entitled to summary judgment as a matter of law.

### A. Applicable Legal Standard For Summary Judgment

Federal Rule of Civil Procedure 56 makes clear that summary judgment is appropriate only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (internal quotation marks and citation omitted).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In determining whether there is a genuine dispute about material facts, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See, e.g.*, *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23-24 (D.C. Cir. 2013); *see also Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).  The moving party may successfully support its motion by identifying those portions of the record that it believes demonstrate the absence of a genuine dispute of material fact.  Fed. R. Civ. P. 56(c)(1)(A).  The non-moving party, for its part, must show more than "[t]he mere existence of a scintilla of evidence in support of" its position; rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]."

*Anderson*, 477 U.S. at 252.  Further, the non-moving party "may not rest upon mere allegations or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks omitted).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989) (alteration in original) (internal quotation marks and citation omitted).  "In assessing each party's motion, all underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *Vaughan v. Amtrak*, 892 F. Supp. 2d 84, 91–92 (D.D.C. 2012) (internal quotation marks and citation omitted).

## B.  The Section 8(a) Program Is Constitutional On Its Face

The Supreme Court repeatedly has noted that "[f]acial challenges are disfavored for several reasons[,]" not the least of which is that such challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (internal quotation marks and citation omitted); *see also Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) ("'A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully.'" (quoting *Salerno*, 481 U.S. at 745)).  Accordingly, it is clear that plaintiffs advancing facial constitutional challenges must satisfy certain heightened standards in order to prevail, even though

"the precise standard for facial challenges remains 'a matter of dispute[.]'" *Gen. Elec. Co.*, 610 F.3d at 117 (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).

The parties in the instant case, like the parties in *DynaLantic*, disagree about which legal standard applies to this particular facial challenge.  (*See* Pl.'s MSJ Br. at 11–12; Defs.' MSJ Br. & Resp. at 27–29); *see also DynaLantic*, 885 F. Supp. 2d at 249. Specifically, Defendants insist that the Supreme Court's decision in *United States v. Salerno* requires Rothe to show that "no set of circumstances exists under which [Section 8(a)] would be valid[,]" *Salerno*, 481 U.S. at 745, in order to prevail (*see* Defs.' MSJ Br. & Resp. at 27), while Rothe relies on the Federal Circuit's decision in *Rothe Development Corp. v. Department of Defense*, 545 F.3d at 1032, for the proposition that *Salerno*'s so-called "no-set-of-circumstances" test is inapplicable here (*see* Pl.'s MSJ Br. at 11–12; *see also* Mountain States Legal Found.'s Br. as Amici Curiae in Supp. of Pl., ECF No. 62, at 12 (arguing that "this Court is not obligated to follow the 'no-set-of-circumstances' test" because "the D.C. Circuit has not truly re-examined [its] applicability" in light of subsequent Supreme Court precedent)).

Faced with these same conflicting positions, the *DynaLantic* court held that the *Salerno* test applies to facial challenges to the Section 8(a) program because "the *Salerno* test has been adopted by this Circuit and [continually] cited with approval[.]" *DynaLantic*, 885 F. Supp. 2d at 249–50.  This Court, too, is persuaded that, in order to justify invalidating all applications of the broad statutory program at issue, Plaintiff must satisfy *Salerno*'s no-set-of-circumstances test, or show that Section 8(a) lacks "any plainly legitimate sweep" because there are not "many circumstances" in which "the statute's application would be constitutional[.]"  *Gen. Elec. Co.*, 610 F.3d at 117

(internal quotation marks and citation omitted); *see also Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014) ("To succeed in a typical facial attack, [a plaintiff] must establish 'that no set of circumstances exists under which [the challenged statutory provisions] would be valid or that the statute lacks any plainly legitimate sweep.'" (quoting *Stevens*, 559 U.S. at 472)).

This Court also agrees with the *DynaLantic* court (and the parties) that, "to the extent that the Section 8(a) program relies on race-conscious criteria," this Court must employ "strict scrutiny" to determine whether its application is constitutional in a particular circumstance. *DynaLantic*, 885 F. Supp. 2d at 250. As explained above, the Section 8(a) program is specifically directed toward "socially disadvantaged individuals" and that category of persons is presumptively determined by reference to race. 15 U.S.C. §§ 637(a)(5); *see also id.* §§ 631(f)(B), 631(f)(1)(C); 13 C.F.R. § 124.103(b)(1). There is no question that "'[r]acial classifications'" such as the ones at issue here "'are constitutional only if they are narrowly tailored measures that further compelling governmental interests.'" *DynaLantic*, 885 F. Supp. 2d at 250 (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995)). (*See also* Defs.' MSJ Br. & Resp. at 26 ("[T]he presumption of social disadvantage in the Small Business Act is race-conscious and is subject to strict scrutiny."); Pl.'s MSJ Br. at 9 ("It is undisputed that the section 8(a) statute contains [a] racial classification . . . and therefore that statutory racial classification is subject to judicial review under strict scrutiny.").)

The requirements for satisfying strict scrutiny—*i.e.*, a compelling government interest and narrow tailoring—are well established. To demonstrate a compelling

interest, Defendants must make two showings: "[f]irst, the government must 'articulate a legislative goal that is properly considered a compelling government interest.'" *DynaLantic*, 885 F. Supp. 2d at 250 (quoting *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 969 (8th Cir. 2003)).  Previously recognized compelling government interests include "'remedying the effects of past or present racial discrimination[.]'" *Id.* (quoting *Shaw*, 517 U.S. at 909).  Second, the government must "demonstrate a strong basis in evidence supporting its conclusion that race-based remedial action was necessary to further that interest." *Id.* (internal quotation marks and citation omitted).  In so doing, the government need not "conclusively prov[e] the existence of racial discrimination in the past or present[,]" *id.* (citing *Wygant*, 476 U.S. at 292 (O'Connor, J., concurring)), and "[t]he government may rely on both statistical and anecdotal evidence, although anecdotal evidence alone cannot establish a strong basis in evidence for the purposes of strict scrutiny[,]" *id.* at 250–51 (citing *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 977 (10th Cir. 2003)).  If the government makes both showings, the burden shifts to the plaintiff "to present 'credible, particularized evidence' to rebut the government's 'initial showing of a compelling interest.'" *Id.* at 251 (quoting *Concrete Works*, 321 F.3d at 959); *see also id.* ("Notwithstanding the initial burden of initial production that rests with the government, the ultimate burden of proof remains with the challenging party to demonstrate the unconstitutionality of an affirmative-action program." (internal quotation marks, alterations, and citation omitted)).

Once a compelling interest is established, the government must further "show that 'the means chosen to accomplish the government's asserted purpose [are]

specifically and narrowly framed to accomplish that purpose.'" *Id.* at 283 (alteration in original) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003)).  Courts consider several factors to determine whether challenged race-conscious remedial measures are narrowly tailored, including:  "(1) the efficacy of alternative, race-neutral remedies, (2) flexibility, (3) over- or under-inclusiveness of the program, (4) duration, (5) the relationship between numerical goals and the relevant labor market, and (6) the impact of the remedy on third parties." *Id.* (citing *United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality and concurring opinions)).

    With the relevant legal standards in mind and consistent with the *DynaLantic* court's reasoning and conclusion, this Court finds that there are no genuine issues of material fact regarding the facial constitutionality of the Section 8(a) program for several reasons.  First, the government has articulated an established compelling interest for the program—namely, remedying "race-based discrimination and its effects[.]"  (Defs.' MSJ Br. & Resp. at 35); *see also DynaLantic*, 885 F. Supp. 2d at 279 (concluding that "Congress has a compelling interest in eliminating the roots of racial discrimination in federal contracting, funded by federal money").  Defendants have also shown a strong basis in evidence that furthering this interest requires race-based remedial action—specifically, evidence regarding discrimination in government contracting, which, as the *DynaLantic* court found, consisted of "extensive evidence of discriminatory barriers to minority business formation, . . . [and] forceful evidence of discriminatory barriers to minority business development," *DynaLantic*, 885 F. Supp. 2d at 279.  In *DynaLantic*, the Court further found that the government had "provided significant evidence that, even when minority businesses are qualified and eligible to

perform contracts in both the public and private sectors, they are awarded these contracts far less often than their similarly situated non-minority counterparts." *Id.* Defendants have relied upon that same evidence in the instant case, and they have also presented expert testimony that corroborates the *DynaLantic* evidence—*i.e.*, Wainwright and Rubinovitz have testified that minority-owned small businesses have faced, and continue to face, significant disadvantages in government contracting that cannot be explained by nondiscriminatory factors (*see, e.g.*, Rubinovitz Report at 12; Wainwright Report at 27, 97)—and Rothe has failed to rebut this evidence with credible and particularized evidence of its own, *see Wygant*, 476 U.S. at 293 (O'Connor, J., concurring).

Furthermore, Defendants have established that the Section 8(a) program is narrowly tailored to achieve the established compelling interest. As the *DynaLantic* court discussed at great length, the Section 8(a) program satisfies all six dimensions of narrow tailoring. First, alternative race-neutral remedies have proved unsuccessful in addressing the discrimination targeted here. *See DynaLantic*, 885 F. Supp. 2d at 283–84 ("Congress attempted to use race-neutral measures to foster and assist minority owned businesses for at least twenty-five years prior to incorporating a race-conscious component in Section 8(a), and these race-neutral measures failed to remedy the effects of discrimination on minority small business owners."). Second, the Section 8(a) program is appropriately flexible. *See id.* at 285–86 (finding that Section 8(a) "imposes no quotas at all[,] . . . provides for aspirational goals and imposes no penalties for failing to meet them[,]" contains a rebuttable presumption of social disadvantage based on race, and thus makes race a "relevant" but not "determinative factor" in program

participation).  Third, Section 8(a) is neither over- nor under-inclusive.  *See id.* at 286 ("Section 8(a) does not provide that every member of a minority group is disadvantaged.  Admittance . . . is based not only on social disadvantage, but also on an individualized inquiry into economic disadvantage. . . .  [And] a firm owned by a non-minority may qualify as socially and economically disadvantaged." (citation omitted)).  Fourth, the Section 8(a) program "impose[s] temporal limits on every individual's participation that fulfill the [durational] aspect of narrow tailoring."  *Id.* at 287 (discussing the program's "strict durational limits" on participation, and the Small Business Administration's "continual[] reassess[ment]" of participants' eligibility).  Fifth, the relevant aspirational goals for SDB contracting participation are numerically proportionate, in part because "[t]he evidence presented established that minority firms are ready, willing, and able to perform work equal to two to five percent of government contracts in industries including but not limited to construction."  *Id.* at 289.  And sixth, the fact that the Section 8(a) program reserves certain contracts for program participants "does not, on its face, create an impermissible burden on non-participating firms."  *Id.* at 290; *see also id.* (discussing various "provisions [in Section 8(a)] designed to minimize the burden on non-minority firms").

Accordingly, this Court concurs with the *DynaLantic* court's conclusion that the strict scrutiny standard has been met, and that the Section 8(a) program is facially constitutional despite its reliance on race-conscious criteria.  *See id.* at 293.  In so holding, this Court incorporates by reference the reasoning in Parts III.A through III.D.1.(c) and Part III.E of the *DynaLantic* memorandum opinion, and adopts it as its own.  *See id.* at 251–80, 283–91.

This means that Rothe's insistence that "[S]ection 8(a)'s racial classification is unconstitutional racial balancing, for which there is no compelling interest, and for which narrow tailoring is impossible" (Pl.'s MSJ Br. at 7) is unavailing, and for good reason.  With respect to the compelling interest factor, Rothe does not appear to dispute that the government has a compelling interest in eliminating discrimination in federal contracting; instead, Rothe maintains that Defendants have failed to show a strong basis in evidence that race-based remedial action is necessary to achieve that interest largely because—as Rothe repeatedly has argued—post-enactment evidence is irrelevant, and the disparity studies on which Defendants rely are flawed.  (*See id.* at 37–43, 48–60.)  This Court has already rejected Rothe's argument against post-enactment evidence and adopted instead the *DynaLantic* court's holding that such evidence is not only admissible but also particularly relevant in the circumstances presented here.  *See supra*, Part II.B.2.  And this Court also finds that "[o]n balance," the disparity studies on which Defendants and their experts rely "reveal large, statistically significant barriers to business formation among minority groups that cannot be explained by factors other than race[,]" *DynaLantic*, 885 F. Supp. 2d at 261, and "demonstrat[e] that discrimination by prime contractors, private sector customers, suppliers and bonding companies continues to limit minority business development[,]" *id.* at 263; *see also id.* ("While the studies are not uniform in nature, methodology, or results, they contain powerful evidence that discrimination fosters a decidedly uneven playing field for minority business entities seeking to compete in federal contracting." (internal quotation marks and citation omitted)).

Moreover, the record evidence clearly shows "that qualified, eligible minority-owned firms are excluded from contracting markets, and accordingly provide[s] powerful evidence from which an 'inference of discriminatory exclusion could arise.'" *Id.* at 268 (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 503 (1989)). To the extent that Rothe argues that the relevant legislative history does not support the conclusion that Congress had a strong basis in evidence to enact the race-conscious provisions of Section 8(a) (*see* Pl.'s MSJ Resp. & Reply at 19–37), this Court disagrees, and instead concurs with the *DynaLantic* court's conclusion that, "[b]ased on the evidence before Congress with respect to both the Public Works Employment Act of 1977, and, a year later, the heavily overlapping legislative history of Section 8(a), . . . Congress had a strong basis in evidence to conclude the use of race-conscious measures was necessary in, at least, some circumstances." *DynaLantic*, 885 F. Supp. 2d at 274.

With respect to narrow tailoring, Rothe is both factually and legally misguided when it argues that Section 8(a)'s race-conscious provisions cannot be narrowly tailored because they "appl[y] across the board in equal measure, for all preferred races, in all markets and sectors." (Pl.'s MSJ Br. at 11; *see also* Pl.'s MSJ Resp. & Reply at 66–68.) This assertion is factually incorrect because, as the *DynaLantic* court noted, "[t]he presumption that a minority applicant is socially disadvantaged may be rebutted if [the Small Business Administration] is presented with credible evidence to the contrary[,]" *DynaLantic*, 885 F. Supp. 2d at 285, and, indeed, "[a]ny person may present 'credible evidence' challenging an individual's status as socially or economically disadvantaged[,]" *id.* at 286 (quoting 13 C.F.R. § 124.103(c)). Rothe has also failed to cite any legal precedent that holds that Congress is categorically prohibited from

fashioning a race-conscious remedial statute that is unlimited in industrial or geographic scope.  In this regard, Rothe appears to be proceeding under the misconception that "narrow" tailoring necessarily means a remedy that is laser-focused on a single segment of a particular industry or area, rather than the common understanding that the "narrowness" of the narrow-tailoring mandate relates to *the relationship* between the government's interest and the remedy it prescribes.  *See Grutter*, 539 U.S. at 333.

Rothe is also mistaken when it argues that the Section 8(a) program should be struck down as not narrowly tailored because purported "overutilization of 8(a) firms in Rothe's primary NAICS codes imposes an undue burden on Rothe[.]"  (Pl.'s MSJ Resp. & Reply at 15.)  With this argument, Rothe invites the Court to compare the "percentage of total small business dollars in federal procurement that 8(a) firms in Rothe's NAICS codes are being awarded . . . to the overall availability of 8(a) firms in Rothe's NAICS codes" and argues that this comparison demonstrates that, far from being underutilized, Section 8(a) program participants in those NAICS codes actually receive a disproportionate share of federal contracting dollars.  (*Id.* at 13.)  Even if this is true—and this Court has significant doubts about the accuracy of Rothe's calculations—Rothe's allegations pertain to a mere five NAICS codes and at best give rise to an as-applied critique; they are manifestly insufficient to warrant invalidation of Section 8(a) *on its face* and in its entirety.

## C. Section 8(a) Does Not Violate The Nondelegation Doctrine

Undaunted, Rothe also contends that, by enacting the Section 8(a) program, Congress has unconstitutionally delegated legislative authority to the executive branch—*i.e.*, that Section 8(a) violates the nondelegation doctrine.  (*See* Pl.'s MSJ Br.

at 40–44.)  Rooted in the principle of separation of powers and derived from Article I of the Constitution, "[t]he nondelegation doctrine prohibits Congress from making unbridled delegations of authority" to other branches.  *Mich. Gambling Opp'n v. Kempthorne*, 525 F.3d 23, 34 (D.C. Cir. 2008); *see also Mistretta v. United States*, 488 U.S. 361, 371–72 (1989).  Indeed, the Supreme Court has explained repeatedly that Congress may only "confer[] decisionmaking authority upon agencies[,]" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001), if it also provides "'an intelligible principle to which the person or body authorized to [act] is directed to conform[,]'" *id.* (first alteration in original) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

Here, Rothe maintains that Section 8(a) contains insufficient guidance "to limit the [Small Business Administration's] discretion in deciding whether racial, ethnic or cultural bias has occurred or even what constitutes a racial, ethnic, or cultural group." (Pl.'s MSJ Br. at 7.)  Rothe is wrong for at least two reasons.  First, Congress has specifically defined "[s]ocially disadvantaged individuals" as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities[,]" 15 U.S.C. § 637(a)(5), and it has further explained that "many such persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control[,]" *id.* § 631(f)(1)(B).  The statute pertaining to the Section 8(a) program also supplies examples of "such groups includ[ing], but [ ] not limited to, Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific

Americans, [and] Native Hawaiian Organizations[.]"  *Id.* § 631(f)(1)(C).  Thus,

Congress has provided clear, intelligible direction regarding who can be deemed

"socially disadvantaged" for the purpose of the statute.  What is more, Congress has

provided additional context by explaining that one purpose of the Section 8(a) program

is to "promote the business development of small business concerns owned and

controlled by socially and economically disadvantaged individuals so that such

concerns can compete on an equal basis in the American economy[.]"  *Id.*

§ 631(f)(2)(A); *see also Mich. Gambling Opp'n*, 525 F.3d at 30 (noting that "a

delegation need not be tested in isolation" and that courts may examine "the purpose of

the Act, its factual background and the statutory context" in addition to "the statutory

language" itself (internal quotation marks and citation omitted)).  Thus Rothe's

assertion that the statute "confers *unlimited* discretion to decide whether racial or ethnic

prejudice or cultural bias has occurred with respect to a given group" (Pl.'s MSJ Br. at

42 (emphasis added)) is simply incorrect.

Second, the circumstances under which the nondelegation doctrine applies to

invalidate a statute are exceedingly limited.  This Court notes that the Supreme Court

has "found the requisite 'intelligible principle' lacking in only two statutes, one of

which provided literally no guidance for the exercise of discretion, and the other of

which conferred authority to regulate the entire economy on the basis of no more

precise a standard than stimulating the economy by assuring 'fair competition.'"

*Whitman*, 531 U.S. at 474 (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935);

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).  Indeed,

"[c]ourts 'have almost never felt qualified to second-guess Congress regarding the

permissible degree of policy judgment that can be left to those executing or applying the law.'" *Mich. Gambling Opp'n*, 525 F.3d at 30 (quoting *Whitman*, 531 U.S. at 474–75).

In sum, because the statute that Congress enacted to establish the Section 8(a) program contains specific definitions and a statement of purpose, and because it is also well settled in this jurisdiction that "[o]nly the most extravagant delegations of authority, [such as] those providing no standards to constrain administrative discretion," are to be "condemned . . . as unconstitutional[,]" *Humphrey v. Baker*, 848 F.2d 211, 217 (D.C. Cir. 1988), this Court concludes that Rothe has failed to show a genuine issue of material fact as to whether Section 8(a) violates the nondelegation doctrine.[9]

## IV.   CONCLUSION

For the reasons discussed above, this Court concludes that the testimony of Defendants' expert witnesses is relevant and reliable, and the Court has considered that testimony in its review of the parties' cross-motions for summary judgment.  By contrast, this Court has found that one of Plaintiff's proffered experts is not qualified to render an expert opinion with respect to the statistical and economic analyses at issue in this case, and the Plaintiff's other expert witness has proffered testimony that is

---

[9] Rothe's reliance on *Schuette v. Coalition to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equality By Any Means Necessary*, 134 S. Ct. 1623 (2014), to support its nondelegation argument is misplaced.  (*See* Pl.'s MSJ Resp. & Reply at 45.)  *Schuette* concerned an Equal Protection Clause challenge to a popularly enacted amendment to Michigan's state constitution, not a nondelegation challenge.  *See Schuette*, 134 S. Ct. at 1629.  Moreover, the plurality opinion in *Schuette* expressed concern about (and noted the Court's prior rejection of) "the assumption that 'members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls.'"  *Id.* at 1634 (quoting *Shaw v. Reno*, 509 U.S. 630 (1993)).  Section 8(a) makes no such assumption.

unreliable and thus not admissible for purposes of this Court's evaluation of whether there is a genuine issue of material fact with respect to Plaintiff's underlying constitutional claim.  Accordingly, Plaintiff's *Daubert* motion is **DENIED**, and Defendants' *Daubert* motions are **GRANTED**.

The Court also concludes that, in light of the record and the legal arguments presented in this case, and in reliance on the reasoning and holding of *DynaLantic* (which this Court has adopted in relevant part), Plaintiff's facial constitutional challenge to the Section 8(a) program fails.  Defendants have demonstrated a compelling interest for the government's racial classification, and the purported need for remedial action is supported by strong and unrebutted evidence, and Defendants have also shown that the Section 8(a) program is narrowly tailored to further its compelling interest.  Moreover, Plaintiff has failed to show either that no set of circumstances exists in which the Section 8(a) program would be constitutional or that the statutory program lacks any plainly legitimate sweep; therefore, there is no genuine issue that the Section 8(a) program's race-conscious provisions are constitutional on their face.  Thus, as set forth in the accompanying order, Plaintiff's motion for summary judgment is **DENIED**, and Defendants' cross-motion for summary judgment is **GRANTED**.

DATE:  June 5, 2015

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

49